UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

SOUTHERN DIVISION

| | |
|---|---|
| JASON ADAM JENSEN,<br>            Plaintiff,<br>v.<br>CITIBANK, N.A., et al.,<br>Defendants. | Case No. 6:22-CV-03140-BCW<br><br>Honorable Judge Wimes Presiding |

**JENSEN'S OPPOSED IN FORMA PAUPERIS MOTION FOR LEAVE TO FILE COUNTERCLAIM COMPLAINT AGAINST UNITED STATES OF AMERICA, STONE COUNTY, MATTHEW J GIST, CHRISTOPHER M. NAPOLITANO, AND ENSZ & JESTER, P.C. IN RESPONSE TO AFFIRMATIVE DEFENSE CLAIMS**

COMESNOW, Plaintiff, Jason A Jensen ("JENSEN"), brings this Motion under 28 U.S. Code § 1915 for Rule 13 (a) and (b) of Civil Procedure. JENSEN did contact Attorney Christopher Napolitano on December 1, 2022 on or about 2:44PM CDT where Mr. Napolitano expressed blanket opposition to any Counterclaims including the prosecution of this Motion and related Counterclaims – not much detail was conveyed. Please note, petitioner uses Mental Health Disabled, Mentally Ill, and Qualified Person interchangeably.

**WHEREAS:**

1. Paramount to the functioning of the Americans with Disabilities is the ability for a petitioner to gain relief.

**WHEREAS:**

2. Congress, in an Act to set Public Policy, did enact 42 U.S. Code § 12101, Findings and purpose, whereas it found (attachment -2 pages of Count towards limitation):

*(1) [...] mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with [...] mental disabilities have been precluded from doing so because of discrimination;*

*(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;*

*(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;*

*(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, **individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;***

*(5) **individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;***

*(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;*

*(7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and*

*(8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.*

*(b) Purpose*

*It is the purpose of this chapter—*

*(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;*

*(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;*

*(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and*

*(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.*

3. Just as important to these Goals, is the Alignment of these Goals with the Purpose and Function of this Great Institution (Court) of Providing Peace and Tranquility in which Discrimination is a cancer thereto.

WHEREAS:

4. Every State has an organization to Enforce the Professional Standards of Attorneys at Law ("Bar"), most Bars have implemented Ethics Rules prescribing the Operation of a Licensed Counselor as an Officer of the Court. Missouri has promulgated the following, relevant, rules of ethics (attachment -2 pages of Count towards limitation):

### RULE 4-3.1: MERITORIOUS CLAIMS AND CONTENTIONS

**A lawyer shall not** bring or **defend a proceeding**, or assert or controvert an issue therein, **unless there is a basis in law and fact for doing so that is not frivolous**, which includes a good faith argument for an extension, modification, or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established.

### RULE 4-4.1: TRUTHFULNESS IN STATEMENTS TO OTHERS

In the course of representing a client a lawyer shall not knowingly:

(a) make a false statement of material fact or law to a third person; or

(b) fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 4-1.6.

### RULE 4-8.4: MISCONDUCT

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c) **engage in conduct involving** dishonesty, fraud, deceit, or **misrepresentation**. […];

(d) **engage in conduct that is prejudicial to the administration of justice**;

(e) state or imply an ability to influence improperly a government agency or official or **to achieve results by means that violate the Rules of Professional Conduct or other law**;

(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law; or

(g) **manifest by words or conduct, in representing a client, bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon** race, sex, gender, gender identity, religion, national origin, ethnicity, **disability**, age, sexual orientation, or marital status. This Rule 4-8.4(g) does not preclude legitimate advocacy when race, sex, gender, gender identity, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or other similar factors, are issues. This paragraph does not limit the ability of a lawyer to accept, decline, or withdraw from a representation in accordance with Rule 4-1.16.

WHEREAS:

5. Paragraphs 2, 5, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, but especially 21, 25, 26, and 29 of STONE County's Response to JENSEN's Amended Complaint violate the Rules of Ethics and Misconduct equating to Malpractice. As noted by Council for Defense of STONE County, Punitive

Damages are usually precluded in cases against Government Entities. The basic theory, supported by essential elements of Common Law, is that a Society or Population which does not control the minutia of actions by the State will be forced to pay sums of relief for damages in which punitive damages cannot function as deterrence for future bad actions. JENSEN would challenge such a supposition where Society and Residents of Stone County engage in discrimination so blatantly and with encouragement, they, themselves become party to the acts. ENSZ & JESTER, P.C. has no such protection. Moreover, where ENSZ & JESTER, P.C. contributed to the Denial of Equality under the Americans with Disabilities Act, they should pay a proportioned percentage of the damages for the same reason Governments are traditionally and normally exempted from punitive damages.

6. Presented in Congress' Findings and formation of the Americans with Disabilities Act was the basic structure: Title I – Employment, Title II – State Government and Political Subdivisions, Title III – Privately Owned/Operated Public Accommodations.

7. Since STONE County has Admitted, in their response, to being a Political Subdivision of Missouri, Title II is the sole Regulatory, by Statute and CFR, authority over STONE unless/until JENSEN applies for employment. Title II and associated CFR, are the confines of STONE's "Affirmative Defenses". However, Paragraphs 21 makes a widely damaging statement about JENSEN which relates to Title III regulations (CFR) making it a blatantly frivolous Affirmative Defense. Further Compounding the frivolousness, Paragraph 25 and 29, which includes reference to "42 U.S. Code § 1981a - Damages in cases of intentional discrimination in employment", is within the realm of Title I.

8. Such behavior is not protected by litigation privilege.

9. Actions admonished above demonstrate a furtherance to Violate JENSEN's 14th Amendment Rights in Violation of 42 USC 1983 IF JENSEN can establish that, at times, an Attorney is a State Actor, when employed by the State for Defense, abuses process in Defense of the Regulated State Entity,

includes actions that "defend a proceeding" that lacked Merit all to undermine Public Policy, Deny Relief, and willfully challenge Congress by engaging in behavior specifically found and sought to eliminate.

10. Even if 42 USC 1983 claims fail, Malpractice, Gross Willful Negligence, Abuse of Process, and other Common Law torts remain.

11. STONE County and Council, did unlawfully expand 42 USC §12111 (3), §12113 (b), and/or §12182 (b) 3 which all state that something similar to "Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others." is a defense to accommodations requests while STONE and Counsel raised the affirmative defense "Stone County affirmatively pleads that Plaintiff posed a direct threat to the health and safety of Plaintiff and/or others."

WHEREAS:

11. Defendant STONE and Counsel, did attempt to make this case impossible for JENSEN and most disabled.

12. In order to accurately address the "Affirmative Defenses" presented by Defendant STONE and Counsel, a Disabled Person would have to read and understand the bulk of the Americans with Disabilities Act and associated CFR pages, creating an undue burden. The fact JENSEN prepaid that burden in anticipation of such disregard for Disabled Pro Se Plaintiff's is irrelevant.

WHEREAS:

13. Mental Health Disorders such as autism, attention deficit hyperactivity disorder (ADHD), bipolar disorder, major depression and schizophrenia are a Race as defined by Law.

14. A Race, which can include physical attributes, such as skin color, is both a social construct and an element of descendance.

15. As the National Institute for Mental Health ("NIMH"), which self-proclaims to be the "lead federal agency for research on mental disorders", published "Research conducted and funded by the National Institute of Mental Health (NIMH) has found that **many mental disorders are caused by a combination of biological**, environmental, psychological, and **genetic factors**. In fact, a growing body of research has found that certain genes and gene variations are associated with mental disorders." (emphasis added) (https://www.nimh.nih.gov/health/publications/looking-at-my-genes)

16. The NIMH went on to elaborate at https://www.nih.gov/news-events/nih-research-matters/common-genetic-factors-found-5-mental-disorders with (attachment -2 pages of Count towards limitation):

>*Major mental disorders traditionally thought to be distinct share certain genetic glitches, according to a new study. The finding may point to better ways to diagnose and treat these conditions.*

>*Scientists have long recognized that many psychiatric disorders tend to run in families, suggesting potential genetic roots. Such disorders include **autism**, attention deficit hyperactivity disorder (ADHD), **bipolar disorder**, major depression and **schizophrenia**. Symptoms can overlap and so distinguishing among these 5 major psychiatric syndromes can be difficult. Their shared symptoms suggest they may also share similarities at the biological level. In fact, recent studies have turned up limited evidence of shared genetic risk factors, such as for schizophrenia and bipolar disorder, autism and schizophrenia, and depression and bipolar disorder.*

>*To take a broader look, an international research consortium conducted an analysis that incorporated data from genome-wide association studies (GWAS) of the 5 major disorders. This type of study involves scanning through thousands of genetic markers in search of tiny variations that appear more often in people who have a particular*

*condition than in those who don't. The research received primary funding from NIH's*

*National Institute of Mental Health (NIMH), along with other NIH components.*

*As reported online in the Lancet on February 28, 2013, the scientists screened for*
*evidence of illness-associated genetic variation among over 33,000 patients. All had been*
*diagnosed with at least 1 of the 5 disorders. A comparison group included about 28,000*
*people who had no major psychiatric diagnosis.*

*The analysis revealed variations significantly associated with all 5 disorders. These*
*included variations in 2 genes that code for the cellular machinery that helps regulate the*
*flow of calcium into neurons. Variation in one of these, called CACNA1C, had previously*
*been linked to bipolar disorder, schizophrenia and major depression. CACNA1C is*
*known to affect brain circuitry involved in emotion, thinking, attention and memory —*
*functions that can be disrupted in mental illnesses. Variation in another calcium channel*
*gene, called CACNB2, was also linked to the 5 disorders.*

*In addition, the researchers discovered illness-linked variation for all 5 disorders in*
*certain regions of chromosomes 3 and 10. Each of these sites spans several genes, and*
*causal factors haven't yet been pinpointed. The suspect region along chromosome 3 had*
*the strongest links to the disorders. This region also harbors certain variations*
*previously linked to bipolar disorder and schizophrenia.*

WHEREAS:

17. The mentally ill are completely helpless politically to enact change, avoid prejudice, seek recourse from those who formulate hatred and prejudice of the entire class under the legal principles of slander and libel.

18. Paramount+ did, with its hit TV Series, wait until after the character Beth Dutton, played by Kelly Reilly, smashed another woman with a bottle near the eye, until referencing the character as "bipolar".

19. Texas Governor, Gregg Abbott, did state, after the Uvalde mass shooting, "We as a state, we as a society need to do a better job with mental health […] Anybody who shoots somebody else has a mental health challenge. Period. We as a government need to find a way to target that mental health challenge and to do something about it." Clearly linking "mental health" and "dangerousness" in the minds of Americans.

20. Every time there is a mass casualty event, the topic of "mental health" is associated.

21. The prejudice of associating mentally health with "dangerous acts", in concert with 42 USC §12111 (3), §12113 (b), §12182 (b) 3, and/or Resulting CFRs, has effectively short-circuited the protections and remedies intended for Mentally Disabled.

WHEREAS:

22. Such exclusions, where the Americans with Disabilities Act excludes itself where the Disabled/Qualified Person is deemed a "direct threat to the health and safety of others" from "Public Accommodations" such as Hospitals are unconstitutionally vague. Given Civil Commitment forces a person in a Hospital, which is only permissible if the accused is a danger to self or others or incapable of self-care, for "Evaluation and Treatment" but then excludes the Americans with Disabilities while there Violates substantial Due Process and Equal Protection. It also fails the Reasonable Test.

WHEREAS:

23. Without attaching to this Case with a Counterclaim, JENSEN may never be able to obtain standing to present these questions.

INTENDED RELIEF SOUGHT IN COUNTERCLAIM:

Equitable and Punitive Damages from STONE and/or ENSZ & JESTER, P.C. et al.

Declaratory relief to the unconstitutional application of the Americans with Disabilities Act with regard to the events in this docket.

Declaratory relief that JENSEN's class of Disability is, after the evolution of scientific topics, a Race for the purposes of Legal Protections, such as Suspect Classification.

*__DUE TO THIS BEING A IN FORMA PAUPERIS MOTION NO RESPONSE FROM ANY PARTY IS PROPPER UNLESS OTHERWISE ORDERED BY THIS COURT.__*

*__JENSEN DID INQUIRE IF PRESENT DEFENDANT OPPOSED THIS MOTION, OPPOSITION WAS EXPRESSED WITHOUT ANY DETAILS.__*

WHEREFORE:

JENSEN prays this Court will grant leave to defendants, that the Jurist believes Justice Requires, to file a response to this document.

JENSEN prays for a General Stay in this Case until currently presented document is disposed of.

JENSEN prays to the Judge of Natural Law that these Words Carry Weight.

JENSEN prays this Court utilizes the In Forma Pauperis procedures in processing this Motion which is ultimately a Counterclaim Complaint or an instrument in furtherance thereto.

JENSEN prays that this Court restore JENSEN's Equity under the Law.

JENSEN prays for this Court Grant this Motion to pursue Counterclaims in response to the Affirmative Defense Claims presented in STONE County's Response, which can be more accurately referred to as a Motion to Dismiss, to JENSEN's Amended Complaint.

JENSEN prays for 14 days to file such a Counterclaim after this Special In Forma Pauperis Motion once Jurist selects valid elements.

This response having service requirements, and in forma pauperis status, if required, and order to serve this document.

Sincerely and Respectfully Submitted,

//s/JasonAJensen

Jason A Jensen

CERTIFICATE OF SERVICE

I, Jason A Jensen, did cause all defendants currently present and in appearance of this Court to be served electronically by the ECF/CM of the Federal Court, on this day the 2st of December 2022.

//s/JasonAJensen